## IN THE CIRCUIT COURT FOR BALTIMORE CITY, MARYLAND

**ROMI ANDERSEN**                               *
1147 Martin Drive                               *
Westminster, MD  21157                          *
                                                *
        Plaintiff                               *
                                                *
v.                                              *
                                                *          Case No.: _____
                                                *
**DEUTSCHE BANK NATIONAL**                      *
**TRUST COMPANY, AS TRUSTEE**                   *
**FOR THE REGISTERED HOLDERS**                  *
**OF SAXON ASSER SECURITIES**                   *
**TRUST 2006-2 MORTGAGE LOAN**                  *
**ASSET SECURITIES TRUST 2006-2**              *
**MORTGAGE LOAN ASSET**                         *
**BACKED CERTIFICATES, SERIES**                 *
**2006-2**                                      *
300 S. Grand Avenue, 41st Floor            *
Los Angeles, CA  90071                          *
Serve On:                                       *
                                                *
C. John Sullivan, Jr., Director, Statutory      *
Agent For Out Of State Corporations             *
Maryland State Department Of                    *
Assessments And Taxation                        *
301 W. Preston St.                              *
Baltimore, MD  21201                            *
                                                *
                                                *
                                                *
And                                             *
                                                *
**SAXON MORTGAGE SERVICES,**                    *
**INC.**                                        *
Serve On:                                       *
CSC-LAWYERS INCORPORATING                       *
SERVICES Company, Resident Agent                *
7 ST. PAUL STREET, SUITE 1660                   *
BALTIMORE, MD 21202                             *
                                                *
And                                             *
                                                *
                                                *
                                                *
                                                *

1

OCWEN LOAN SERVICING LLC          *
Serve On:                         *
CSC-LAWYERS INCORPORATING         *
SERVICES Company, Resident Agent  *
7 ST. PAUL STREET, SUITE 1660     *
BALTIMORE, MD 21202               *
                                  *
    Defendants                *

## COMPLAINT & REQUEST FOR JURY TRIAL

Plaintiffs Romi Andersen ("Ms. Andersen"), through her undersigned counsel files this Complaint and Request for Jury Trial and say in support:

### I. INTRODUCTION

1. The underlying matter involves just one thousands of other similar situations across the State where homeowners are (i) seeking to change and modify their current mortgage loans without requesting additional credit, (ii) complying with all requests of their servicer/lender in making the requests, but (iii) all their reasonable steps are ignored in bad faith and the homeowners are left with no other option but to seek the assistance of the Courts. To add insult to injury, many servicers implemented (iv) bogus signature practices to fast track foreclosures, like the underlying matter, without regard to the integrity of the judicial system and basic due process.

2. These claims concern the utter failure of Defendants Ocwen Loan Servicing, LLC ("Ocwen") and its principal, Defendant Deutsche Bank National Trust Company, as Trustee for the registered holders of Saxon Asser Securities Trust 2006-2 Mortgage Loan Asset Securities Trust 2006-2 Mortgage Loan Asset Backed Certificates, Series 2006-2 ("Saxon 2006-2"), to comply with Federal and Maryland law related to Ms. Andersen's

2

reasonable and appropriate requests to modify their mortgage loan subject to this action without seeking additional credit. In addition, Ocwen, and Ms. Andersen's previous mortgage servicer, Saxton Mortgage Services, Inc. ("Saxon Mortgage") has failed to comply with their duty, as Maryland licensed mortgage servicers, to act in good faith.

3. Many, but not all, Maryland homeowners facing foreclosure have reasonable and sustainable solutions to their mortgage situation. Ms. Andersen does have a sustainable solution, yet the Defendants, by and through their authorized agents and employees, are threatening a wrongful foreclosure—otherwise known as an adverse action—on Ms. Andersen's home and property without having first even complied with federal or state law or regulations in the first instance.

4. Further, and very significant to Ms. Andersen, but for the botched loss mitigation efforts by the Defendants, Ms. Andersen has suffered and continues to suffer direct and proximate damages resulting from the unresolved mortgage situation which prevents her from obtaining a security clearance in her field and thereby also reduces her ability to earn more salary then she is presently earning.

5. Further, if the foreclosure sale of Ms. Andersen's home and property proceeds, Ms. Andersen will sustain significantly greater economic damages and losses as a result through further loss of their home, emotional damages as a result of those proceedings and the Defendants' actions (directly and indirectly through their authorized agents and affiliates).

## II. PARTIES

6.      Ms. Andersen is a resident of the State of Maryland and is the owner of the real property commonly known as 1147 Martin Drive, Westminster, MD  21157 ("the Property").

7.      Defendant Deutsche Bank National Trust Company, as Trustee for the registered holders of Saxon Asser Securities Trust 2006-2 Mortgage Loan Asset Securities Trust 2006-2 Mortgage Loan Asset Backed Certificates, Series 2006-2 ("Saxon 2006-2"). Upon information and belief, Saxon 2006-2 is organized under the laws of the State of Delaware.  Saxon 2006-2 also claims to be the owner of the residential, mortgage loan subject to this action to which Ocwen acts as its authorized servicer presently and Saxon Mortgage  previously acted as the mortgage servicer.

8. Defendant Saxon Mortgage Services, Inc. ("Saxon Mortgage") is a Texas corporation which services hundreds of mortgages throughout the State of Maryland and Baltimore City.  Saxon Mortgage is also licensed by the Maryland Commissioner of Financial Regulation (License No. 18740).

9. Defendant Ocwen Loan Servicing, LLC ("Ocwen") is a Delaware Corporation which services hundreds of mortgages throughout the State of Maryland and Baltimore City. Ocwen is also licensed by the Maryland Commissioner of Financial Regulation (License No. 11269).

10. Not named as a party to this action the law firm of Shapiro & Burson, LLP is a member of the Logs Network which is a nationwide network of affiliated law firms and trustee companies.  Shapiro & Burson LLP was the authorized agent of Saxon for certain foreclosure proceedings described herein.

4

## III.  JURISDICTION & VENUE

11. This Court has jurisdiction asserted because Defendants transact business and perform work and services in Maryland and each has availed themselves to the jurisdiction of this Court through their appointed agents including Shapiro & Burson LLP, Bierman, Geesing, Ward, and Wood, LLC, and other foreclosure trustees in this Court.

12. Declaratory and injunctive relief are available pursuant to Md. Code Ann., §§ 3-401-3-415.

13. Venue is appropriate in this Court because the Defendants conduct business within the Baltimore City, Maryland.

## IV. FACTS

### A.     The Foreclosure Crisis

14. Over the last four years, Maryland and, indeed, the United States have been in a foreclosure crisis.  Recent news reports have established that one in ten American homes is at risk of foreclosure.

15. The number of Maryland properties with foreclosure filings has increased substantially throughout the last four years.

16. Increased foreclosures have a detrimental effect not just on the borrowers who lose unique property and face homelessness, but also on the homes surrounding a foreclosure and, perhaps, neighborhoods that suffer decreased property values and municipalities that lose tax revenue.

5

17. The foreclosure crisis is far from over. Economists predict that interest rate resets on the riskiest of lending products will not reach their zenith. *See* Eric Tymoigne, Securitization, Deregulation, Economic Stability, and Financial Crisis, Working Paper No. 573.2 at 9, Figure 30 *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1458413 (citing a Credit Suisse study showing monthly mortgage rate resets).

18. Since the commencement of the crisis, revelations of bogus, false, and deceptive "robo signing" have come to light involving national lenders and mortgage servicers. In Maryland the illegal "robo-signing" issue has even come to the forefront because attorneys and substitute trustees, including those acting on behalf of Saxon and Ocwen have admitted that they filed bogus documents in hundreds of foreclosure cases filed in state courts.

   **B.    Maryland's Response to the Foreclosure Crisis**

19. In 2007 at the beginning of the crisis, Governor O'Malley convened a task force of representatives to address the crisis that was then underway. The Maryland Homeownership Preservation Task Force produced a report which aptly summarized the devastating effect of foreclosures on the community as follows:

   Foreclosures have a devastating effect on homeowners and the communities in which they live. Frequently, a homeowner who loses his or her home to foreclosure loses the accrued equity. A property sold in a foreclosure sale typically draws a lower price than it would in a regular market sale. In the first half of 2005, Maryland's "foreclosure discount" was 18.8 percent, according the St. Ambrose Housing Aid Center, Inc. This is a tragedy for a growing number of Maryland families.

   Extensive damage is felt in neighborhoods and communities across Maryland. Research shows that with every foreclosure on a single family home, the value of homes within an eighth of a mile declines by about nine-tenths of a percent.

Property tax revenues decline proportionally, causing a negative impact on state and local governments. A study of foreclosures in Chicago in 2005 estimated that a single foreclosure costs city government up to $5,000 or more.

Foreclosures also bring with them the potential for more violent crime. Research indicates that for every single percentage point increase in the foreclosure rate in a neighborhood, violent crime in that neighborhood increases by about two percent. Foreclosures can lead to vacant or neglected properties, which create an eyesore and become targets for vandalism. This can tip a community from one dominated by homeowners to one dominated by investors.

Of course, the lending industry and investors also take a hit from rising foreclosure rates. Some major lenders have closed their doors, declared bankruptcy or shuttered their subprime lending arms as a result of the waning demand for risky mortgage products in investor markets. Lenders typically lose $50,000 or more on a single foreclosure, according to information from St. Ambrose Housing Aid Center, Inc. The banking industry cites a figure well over $60,000.

Maryland Homeownership Preservation Task Force Report at 12 (November 29, 2007)

*available at* http://www.gov.state.md.us/documents/HomePreservationReport.pdf

(footnotes omitted).

20. To reasonably address and avoid some of the negative consequences of foreclosure, the

Task Force Report made nine general recommendations that are relevant to the issues

before the Court. *See Id.* at 40-43.

21. In response to the expanding foreclosure crisis and the Task Force Report, the General

Assembly introduced and passed several bills during the 2008 legislative session to

change Maryland's foreclosure process and curb certain predatory real estate processes.

These bills were passed with nearly complete bi-partisan support. As summarized in the

General Assembly's 90 Day Report for the 2008 session:

Until [2008], Maryland's foreclosure process, from the first foreclosure filing to final sale, had been among the shortest in the nation. Maryland is a quasi-judicial State, meaning that the authority for a foreclosure sale is derived from the

mortgage or deed of trust, but a court has oversight over the foreclosure sale process. Most mortgages or deeds of trust include a "power of sale" (a provision authorizing a foreclosure sale of the property after a default) or an "assent to decree" (a provision declaring an assent to the entry of an order for a foreclosure sale after a default). Under the Maryland Rules, it was not necessary to serve process or hold a hearing prior to a foreclosure sale pursuant to a power of sale or an assent to a decree. Consumer advocates contended that the short timeframes and weak notice provisions in State law seriously limited a homeowner's options to avoid foreclosure by, for example, working out a payment plan with the lender or selling the house. In addition, filing a request for an injunction to stop the sale is expensive, time consuming, and not a realistic option for most homeowners.

*Senate Bill 216 (Ch. 1)/House Bill 365 (Ch. 2)*, emergency legislation that took effect April 4, 2008, make a number of significant changes to the foreclosure process in Maryland for residential real property. "Residential property" is defined under the Acts to mean real property improved by four or fewer single-family dwelling units. Except under specified circumstances, the Acts prohibit the filing of an action to foreclose a mortgage or deed of trust on residential property until the later of 90 days after a default in a condition on which the mortgage or deed of trust states that a sale may be made or 45 days after the notice of intent to foreclose required under the Acts is sent.

. . . .

*Senate Bill 217/House Bill 360* define "mortgage fraud" as any action by a person made with the intent to defraud that involves:

• knowingly making, using, or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that it will be relied upon by a mortgage lender, borrower, or any other party to the lending process;

• receiving any proceeds or any other funds in connection with a mortgage closing that the person knows resulted from the aforementioned actions;

• conspiring to violate either of the preceding provisions; or

• filing or causing to be filed in the land records in the county where a residential real property is located any document relating to a mortgage loan that the person knows to contain a deliberate misstatement, misrepresentation, or omission.

> Under the Acts, the "mortgage lending process" includes the solicitation, application, origination, negotiation, servicing, underwriting, signing, closing, and funding of a mortgage loan, as well as the notarizing of any document in connection with a mortgage loan.

Md. Dept. of Legislative Services, The 90 Day Report, A Review of the 2008 Legislative Session, F16-18 (April 11, 2008) *available at* http://mlis.state.md.us/2008rs/90-Day-report/index.htm.

22. The Maryland Court of Appeals recently adopted in October 2010 an emergency rule to deal with the robo-signing issue based upon the recommendation of the Standing Committee on Rules of Practice and Procedure. Writing for the Committee the Honorable Alan M. Wilner explained:

> The need for these changes emanates from recent revelations regarding the filing in residential foreclosure actions of affidavits as to which the affiant either did not have sufficient knowledge of the facts stated in the affidavit to validly attest to their accuracy or did not actually read or personally sign the affidavit. Preliminary audits have shown that hundreds of such affidavits have been filed in Maryland circuit courts. Up to this point, courts, with good reason and really of necessity, have relied on the accuracy of affidavits, especially when filed by attorneys, unless there is something on the face of the document to suggest otherwise or the validity of the affidavit is challenged. Evidence that has recently come to light, largely through admissions under oath by the affiants themselves, has shaken the confidence that the courts have traditionally given to those kinds of affidavits.

> In the Committee's view, the use of bogus affidavits to support actions to foreclose liens on property, apart from prejudice to the homeowners, constitutes an assault on the integrity of the judicial process itself.

Letter from A. Wilner to the Court of Appeals, Oct. 15, 2010.

23. In further response to the foreclosure crisis, Maryland Commissioner of Financial Regulation required for its licensees "a duty of good faith and fair dealing in communications, transactions, and course of dealings with a borrower in connection with

the…servicing…of any mortgage loan, including, but not limited to…(3) The duty when servicing mortgage loans to: (a) Promptly provide borrowers with an accurate accounting of the debt owed when borrowers request an accounting; (b) Make borrowers in default aware of loss mitigation options and services offered by the licensee; (c) Provide trained personnel and telephone facilities sufficient to promptly answer and respond to borrower inquiries regarding their mortgage loans; and (d) Pursue loss mitigation when possible." Md. Code Regs. 09.03.06.20.    As Maryland licensed mortgage servicers Ocwen and Saxon have contractually agreed to this duty and as discussed below has utterly failed in fulfilling their responsibilities.

C.    **Ms. Andersen's Mortgage Subject to this Transaction**

24. On or about May 31, 2006, Ms. Andersen refinanced the Property with a purported mortgage lender, Savings First Mortgage, LLC ("Savings First"). Upon information and belief Savings First was in fact not the mortgage lender but participated in a table-funded transaction where it was identified as the lender in the transaction but the funds for the transaction were actually provided by another party—i.e. the true lender.

25. Mortgage Lenders Network, National City Mortgage, and potentially other mortgage originators were actually the original lenders who provided the funds for transaction as opposed to Savings First.

D.    **Ms. Andersen's Mortgage Situation with Saxon**

26. Unfortunately, like millions of other Americans, Ms. Andersen was laid off of her position as a Quality Assurance lead in January 2008. At this time she began, as a result of the lay off as well as her husband's contract work ceasing, the family began to suffer financial difficulties.

27. Acting as a responsible borrower, Ms. Andersen contacted Saxon and informed them of the situation and explained that she was seeking new work. Ms. Andersen also asked Saxon to consider her for loan modification or other loss mitigation appropriate for her situation. Ms. Andersen continued making her payments at that time. Saxon offered her an adjusted payment plan for a period of several months.

28. Ms. Andersen did obtain a new job in March 2008. Soon after that time she contacted Saxon's modification department and provided Saxon with a financial packet which had been provided to her by Erica Franklin at Saxon. Ms. Andersen asked Saxon for a modification which would lower her payments to something more affordable and within her means. Saxon promised to consider her for a modification as soon as possible. However, that promise did not occur and was false.

29. Ms. Andersen discovered in June 2008 that her April 2008 modification request had been given to Jeff Aldridge (ex. 207680) but that he had left the company and no one had assumed the files left on his desk, including Ms. Andersen's file, and it was just ignored. This admission was made to Ms. Andersen on June 25, 2008 by Linda (teller number 10085). Linda also told Ms. Andersen to stop making any more payments until the modification was complete and that her ARM was frozen (i.e. would not adjust further) with a balance due at the end of the loan. However, a letter sent to Ms. Andersen on May 27, 2008 stated that her ARM would be increasing to 9.5% as of July 1, 2008. In addition, on July 3, 2008, Ms. Andersen received a letter of Default stating that a payment had not been made since May even though she had made every modified payment.

30. Trina Higgenbotham, VP of Loss Mitigation, contacted Ms. Andersen on August 1, 4-8, 21-22, 2008 about her situation. Ms. Higgenbotham made multiple representations to

11

Ms. Andersen that she would work with Ms. Andersen to accomplish a modification of the loan that would be affordable.

31. Ms. Higgenbotham also represented to Ms. Andersen on or about August 21, 2008 that when Ms. Andersen made a certified payment of $1542.86 on August 8, 2008 as she requested, that no foreclosure proceeding would occur while her modification request was pending.

32. During the time from June through August 2008, Ms Andersen also spoke with multiple other Saxon representatives who also made numerous false promises to Ms. Andersen that they were considering her modification requests but never did so. The dates of these other conversations were on 1/28/08, 6/25, 6/28-29, 7/3, 9, 8/6-8. 8/21.

33. Frustrated that nothing was happening as had been promised, Ms. Andersen hired U.S. Homeowners Assistance to communicate with Saxon.   Saxon acknowledged on September 11, and September 12 that Saxon would communicate with U.S. Homeowners Assistance. However, Saxon later falsely explained that it would not communicate with U.S. Homeowners Assistance because it did not have a client authorization on file. These later representations were false since Saxon had stated in wiring on 9/11-12 that it would communicate with them. Soon after on November 9, 2008, Ms. Andersen received another increase to her ARM to 10.5% even it was promised to her that the loan was frozen.

34. Despite its promises to the contrary, Saxon never considered Ms. Andersen's modification requests and instead proceeded to foreclosure through its authorized attorneys Shapiro and Burson, LLP in the Circuit Court for Carroll County on December

12

22, 2008.  Saxon also never provided Ms. Andersen with a written or oral denial of her modification requests before continuing to foreclosure.

35. Ms. Andersen was not served with the Shapiro & Burson Order to Docket until or about January 19, 2009.  She called Shapiro & Burson in response that Saxon was not likely going to consider her for a modification and that it had requested that her sale date be scheduled.

36. Frustrated with their lack of results, Ms. Andersen fired U.S. Homeowners Assistance on or about January 2009 and retained the services of Marie Macalister of Reliable Mortgage Modification LLC to assist her efforts.

37. Compounding matters for Ms. Andersen she became unemployed in January 2009 as well and began to receive unemployment.  At that time, Ms. Andersen sent Saxon a Real Estate Settlement Procedures Act ("RESPA") Qualified Written Request seeking specific information from it.  Saxon never responded.

38. Through her persistence Ms. Andersen was able to obtain a modification offer from Saxon Mortgages dated February 26, 2009 (but the offer was not sent for several weeks and not received by her until March 21, 2009).  Ms. Andersen accepted the offer, signed all the required papers, and sent all the requested documents back to Saxon in the manner requested on March 22, 2009 including a certified check in the sum of 1183.57.

39. Saxon representative Kendall Mason acknowledged receipt of the completed loan modification on Wednesday, March 25, 2009 at 1:08PM in an email to Ms. Andersen. Mr. Mason explained that the certified funds and PMI credits and deductions Ms. Andersen provided would be applied to her first payment on the loan modification ("Saxon Modification Agreement").

40. Pursuant to the Saxon Modification Agreement, Ms. Andersen believed that she had obtained a sustainable solution to her mortgage and because of the prepaid sums and certified sums she had made she actually did not have to make another further payments on the modification until September 2009.

41. Ms. Andersen made her timely modification payments that were due and owing from September 2009 through approximately March, 2010.

42. Ms. Andersen's loan servicer transferred from Saxon to Ocwen on or about November 20, 2009.

43. At the time of transfer of the loan serving from Saxon to Ocwen, Saxon's statements to Ms. Andersen showed her loan as current.

44. However, Ocwen failed to honor the modification upon transfer of the mortgage servicing rights by trying to change the terms of the modification. Specifically and unjustifiably Ocwen demanded in December 2009 that the loan needed to adjust from the 4% fixed loan she had agreed to with Saxon before it was required to further adjust under the terms of the modification. At the time of the loan transfer, Ocwen also provided a different loan balance that was not consistent with that which had been reported by Saxon. Ocwen also began adding additional fees which were not explained such as a new arrears sum of more than $42,000 when if fact the modification determined that Ms. Andersen's arrears on the loan was the fixed sum of $34,235.12 and this sum would be due as a balloon payment at the end of the term of the loan.

45. Ocwen failed to acknowledge the loan modification, believed that Ms. Andersen was in default of her loan at the time it acquired the mortgage servicing rights, and demanding Ms. Andersen bring the loan current.

46. In March 2010, Ocwen requested Ms. Andersen to apply for a new modification. On or about March 28, 2010, Ms. Andersen submitted the modification to Shweta Bajaj by email (shweta.bajaj@ocwen.com) for a possible HAMP modification. Ms. Andersen and Ms. Bajaj had follow-up calls regarding the modification on March 2, April 8, April 23, twice on April 28, May 6, May 18, May 21 and May 22, 2010.

47. On or about May 2, 2010, Ms. Andersen sent Ocwen payment information along with a statement of financial distress to Ms. Bajaj. Ms. Andersen also requested that Ocwen provide a statement requested by Ms. Bajaj and Ocwen's underwriting department because they wanted proof that Ms. Andersen had at least nine months of unemployment payments left. Ms. Andersen submitted that statement to Ms. Bajaj on or about May 10, 2010 and was told that the modification was awaiting approval. Ms. Andersen was also told this by Ms. Bajaj in March and in multiple subsequent phone calls not to worry about foreclosure because the impending modification would prevent the foreclosure from occurring. Upon information and belief, Ocwen has records of these calls in its records.

48. On or about May 25, 2010, Ms. Andersen received a call from Meeta Bajaj and was told that the modification was denied because of non-affordable status. However, Ms. Bajaj put through a new in-house modification and told Ms. Andersen that she would hear something about that request within 24-48 hours.

49. On or about May 26, 2010, Ms. Andersen contacted Ms. Meeta Bajaj and Ms. Shweta Bajaj by email to inquire as to the status of the In-House Modification. After several attempts to obtain information, Ms. Meeta Bajaj finally corresponded with Ms. Andersen and told her that everything would be fine and not to worry. After leaving another

message on May 27, 2010 Ms. Meeta Bajaj returned the call on or about the same day left Ms. Andersen a message stating that there was no news on the modification.

50. On or about May 31, 2010, Ms. Andersen called again for a status update and spoke with Vibha Nag who informed Ms. Andersen that she was the new contact for modification and that she was still waiting for an answer from underwriting. Ms. Andersen expressed concern that foreclosure proceedings would be started because it was the end of the month and Ms. Nag told her not to worry.

51. Ms. Andersen called again on or about June 1, 2010 and spoke with Mohammed Rehman who informed her orally but not in writing that upper management had denied the modification because of principal discount. Ms. Andersen inquired as to whether the modification could be approved if the APR change was dropped from the modification. Mr. Mohammed Rehman refused to work with Ms. Andersen and she requested that a manager call her to discuss her options. Ms. Andersen never received a call from a manager.

52. On or about June 3, 2010, Ms. Andersen received a call from Karen of Ocwen's Early Intervention Department who informed her that her account was with the Home Retention Department and was still under review. During the time period of June 2-9, 2010, Ms. Andersen began receiving phone calls throughout the day from Ocwen's customer service department but when she answered the phone, she was hung up on by Ocwen's dialer system and the call never went through. On or about June 4, 2010, Ms. Andersen tried to contact the Home Retention Department and ended up speaking with Nelofar Khan. Mr. Khan updated Ms. Andersen's financial information and applied for a new modification with a payment of $1,239.99 including taxes and insurance with a

16

reduction in principal by $140,826.28. The first payment would be due June 21, 2010 and August 1, 2010. Mr. Khan told Ms. Andersen that she qualified for the modification and when she received the approval, she was to verify receipt, fax, email or mail everything to Ocwen and submit payment.

53. Ms. Andersen received a call from customer service on or about June 9, 2010 stating that it could take up to 20 days for final approval. Ms. Andersen also received an email for confirmation of documents to the loss mitigation department.

54. On or about June 10, 2010, Ms. Andersen received a foreclosure notice from a lawyer's office—Bierman, Geesing , Ward, & Wood, LLC. Ms. Andersen called and spoke with paralegal David Bayard the same day from that office who told her that due to the impending modification, the foreclosure is on hold but she could not do anything if Ocwen didn't stop the foreclosure intent. Mr. Bayard told her that she should contact him if she had any questions or needed help when the foreclosure reached the 45-day hold.

55. Ms. Andersen spoke with Adnan Khan on or about June 12, 2010 who told her that the modification had been denied according to Ocwen's standards and that the investors did not want to lower her percentage rate. Mr. Khan told Ms. Andersen he would call her the following week to begin a new modification but he never called

56. On or about June 17, 2010, Ms. Andersen received her loan documents from Saxon so that she could prove that the original mortgage terms listed by Ocwen were incorrect. Ms. Andersen also contacted MDHope and spoke to Isela in the Escalation Department who, based on the facts and the severity of the case, decided to contact Ocwen. They spoke together to Anita at Ocwen who stated that they would have the modification

17

looked at by Ocwen's underwriting department and promised to call by Tuesday. Ocwen never returned the call. When Ms. Andersen and Isela called to follow up, they received an automated message that stated that Ms. Andersen's current payment was due August 1, 2010 in the amount of $1,465.92.

57. Ms. Andersen called the MDHope hotline again and Leeann Euler told her she should have qualified for the HAMP or the UP program (a special loan modification program for unemployed persons) persons.

58. Ms. Euler of MDHope hotline and Ms. Andersen called Ocwen to determine that status of the modification on or about June 21, 2010. Ocwen's auto response system said that Ms. Andersen's reinstatement was effective August 1, 2010 in the amount of $1,465.82. They then spoke with Raja who claimed that Ms. Andersen had been denied several times for the In-house modification loans. When asked about the HAMP loan, Raja claimed that Ms. Andersen was denied because Ocwen was not able to create affordable income for her. Raja told her to create a letter from her mother and sister verifying that her income had changed. In addition, he wanted Ms. Andersen to state all new financial numbers, fax information over and then call within 24 hours to verify. In addition, on or about the same day, Ms. Andersen had also received a letter dated June 10, 2010 stating that her modification was still in process. .

59. On or about June 21, 2010, Ms. Andersen received a Notice of Intent to Foreclose letter dated June 16, 2010. The contact person listed in the letter was Cindy White but when Ms. Andersen called, it went into a voice mail belonging to Allie Fleece. The Notice of Intent to Foreclose stated Ms. Andersen needed to pay $5,797.58 by June 18, 2010 to avoid foreclosure. On or about June 22, 2010, Ms. Andersen called the number again on

the Notice of Intent to Foreclose letter and spoke with Marie "Stephanie" Commotto in Uruguay who looked at the account and stated that it was "a mess" and wanted to re-work a HAMP modification. Ms. Commotto promised Ms. Andersen she would rework the numbers and call her back by the next day. Ms. Commotto also admitted that there were too many denials for too many different reasons and that the problem needed to be fixed. She promised that a modification would be worked out for Ms. Andersen.

60. On or about June 23, 2010, Ms. Commotto called with a new loan modification proposal.

61. On or about July 7, 2010, Ms. Andersen received a proposed modification agreement stating the loan balance is $379,093.11 with a payment of $1,418.98 with a rate change to 5% on September 1, 2013. Ms Andersen spoke with Ms. Commotto who stated that this was not the loan modification she had submitted. Ms. Commotto said to Ms. Andersen that she would call underwriting every day until she had a response as to why this happened and why the terms of the modification had been changed.

62. On August 2, several OCWEN representatives called Ms. Andersen's home and discussed her personal information with unauthorized persons. Ms. Andersen made a complaint about these communications on Ocwen's complaint line (800/390-4656) and spoke to Angelica Prabhakara at 6:17pm the same day about the improper disclosures.

63. On or about August 12, 2010, Ms. Andersen spoke again with Ms. Commotto who wanted to apply for a new modification and suggested an Unemployment Program (UP) modification. An UP modification would provide Ms. Andersen with a forbearance, which is a temporary period of time during which your regular monthly mortgage payment is reduced or suspended. Ms. Commotto said she would review everything and follow up with Ms. Andersen.

64. On or about September 1, 2010, Ms, Andersen received an UP modification and completed the required paperwork and submitted it to Ocwen on or about September 2, 2010.

65. Ms. Andersen received an Ocwen statement on or about September 26, 2010 indicating a zero balance due. There were some new charges appearing on the statement for the first time.

66. On or about October 7, 2010, Ms. Andersen's job offer was rescinded because of a credit report disclosure on her foreclosure. On October 8, 2011, Ms. Andersen received a call from her employer reinstating her job offer but her security clearance was put on hold until the foreclosure/mortgage issue was resolved. Ms. Andersen left a message on the same day for Ms. Commotto at Ocwen but received no response.

67. On or about October 9, 2010, Ocwen contacted Ms. Andersen to advise her that the September 26, 2010 statement was in error and they would send her a corrected one. They also verified that the UP modification was still pending.

68. On November 1, 2010, Ms. Andersen received a false and untrue letter from Ocwen stating she had never responded to Ocwen's requests for information and therefore the foreclosure would not be stopped. As demonstrated above, this was a false and untrue as Ms. Andersen responded to each and every request from Ocwen for information by providing complete information.

69. On November 24, 2010 at 2:00PM, through her certified housing counselor Mary Hunter, Ms. Andersen submitted another complete loan modification to Ocwen through their email account (i.e. hrcprocessor-incomevalidation@ocwen.com). This application again sought to reduce her payments to a sustainable level without seeking any additional

credit. The application included sufficient documentation demonstrating Ms. Andersen's new employment and income.

70. Ms. Andersen spoke with Samuel at Ocwen in Uruguay on or about January 21, 2011 and was told that Ms. Commotto no longer was employed by Ocwen. At that time, Ocwen's records indicated that Ms. Andersen was over $16,836.22 in arrears since March 1, 2010. Ocwen's statement was unfairly and deceptively stating that over $54,000.00 in arrears during the same time period. Ms. Andersen was also told that the modification was still in progress but was financially approved.

71. On February 12, 2011 after obtaining counsel, Ms. Andersen learned for the first time from counsel that Ocwen was not honoring the original March 2009 Saxon Modification and that it was also adding fees that are not supposed to charged to her.

72. On or about February 14, 2011, Ms Andersen called Ocwen and spoke with Ignacio who informed her that the payment is now $1,465.82, there is a negative escrow balance and that the total amount due is $18,248.78. Ms. Andersen advised Ocwen that she could not send payment for escrow because of the loan modification in process. Ignacio falsely told Ms. Andersen she cannot proceed with a modification because there is no resolution to her income issue. Ms. Andersen was also falsely advised by Ignacio that she needed to get more income or pay total amount.

73. On or about February 16, 2011, Ocwen falsely claimed to have no loan modification documents from Ms. Andersen.

74. On or about February 24, 2011, Ms. Andersen spoke with Robbie at Saxon who informed her that her request for back statements was denied because the statements were in archives. Robbie did, however, provide a payment history detailing the payments that

were advanced from May, June, July and August and shows write-off of all fees. Robbie also informed Ms. Andersen that her modification was in house and that they do not do a trial period so it would not be sent out. In addition, Ms. Andersen was informed that all documents were sent to Ocwen and should have been honored because Saxon 2006-2 honored it.

E.    **The Bogus Foreclosure Collection Actions**

75. As part of its bogus, unfair, and deceptive collection practices, Saxon 2006-2 allegedly appointed certain trustees from the firm of Shapiro & Burson LLP on or about September 10, 2008. This appointment was recorded in the land records for Carroll County at Book 5616, Page 0190.

76. Ms. Andersen believes the appointment was bogus because it was purportedly signed by Bethany Hood as the Assistant Vice President of Saxon 2006-2. Bethany Hood was actually an employee of Lender Processing Serving ("LPS").

77. According to a public filing in a related matter involving LPS and another mortgage servicer, LPS has admitted its bogus signature practices as follows:

   a. In a public filing in the District Court of Dallas County, Texas, *American Home Mortgage Servicing, Inc. v Lender Processing Services, Inc. et al.*, Case No. 11-10440 (Filed August 23, 2011)("*AHMSI v. LPS*"), AHMSI has made significant admissions in a judicial proceeding that are relevant to and directly relate to the facts alleged herein concerning the debt collection practices of Saxon, Ocwen, and LPS since LPS's practices were uniform and consistent for the various servicers with who it is affiliated.

22

b. In *AHMSI v. LPS*, AHMSI admits that LPS directly and indirectly through its subsidiary and affiliates "improperly executed, notarized, and recorded thousands of assignments upon which AHMSI relied in the course of pursing foreclosure proceedings." *AHMSI v. LPS*, Preliminary Statement at Page 1.

c. "As the servicer, AHMSI provides a wide array of services to the [owners of the loans it services], including, but not limited to, collecting principal, interest, tax, and insurance payments from homeowners and, when necessary, initiating foreclosure proceedings on behalf of the [owner of] the loan." *AHMSI v. LPS* ¶ 10.

d. LPS, acting on behalf of AHMSI, "allowed [its] employees other than those appointed as Special Officers of AHMSI to execute certain assignments on the Special Officers' behalf. Instead of signing their own names, the [unauthorized] surrogates signed the names of the Special Officers, meaning the person whose name appeared on the...documentation was not the person who appeared before the witness or notary. Notaries working under [LPS'] direction and control improperly notarized the assignments containing signatures of surrogates rather than the Special Officers authorized by AHMSI to sign the documents. The delegation of signing authority to surrogates exceeded the scope of [LPS'] authority under AHMSI's corporate resolutions. As a consequence, the assignments executed by the surrogates did not comply with Defendants' contractual obligations." *AHMSI v. LPS* ¶ 21.

e. "On November 16, 2009, AHMSI's board approved" a resolution of signing authority to LPS employees acting as "Special Officers to the ministerial act of

executing mortgage assignments and other designated documents." *AHMSI v. LPS* ¶ 24. However, that resolution did not permit "the delegation of that signature authority to surrogates." *Id.*

    f. LPS admitted to AHMSI in "late November 2009...[that LPS'] agents surrogate signed more that 30,000 assignments of mortgage relating to properties in all 50 states and the District of Columbia." *AHMSI v LPS* ¶ 25.

    g. LPS has admitted to AHMSI that certain notarizations in foreclosure documents executed by LPS on behalf of AHMSI "contained a notarization error" and certain foreclosure papers "may have contained errors in their execution." *AHMSI v. LPS* ¶¶ 34-35.

78. Upon information and belief LPS has acknowledged the same bogus practices to both Saxon and Ocwen as it did to AHMSI. Ms. Andersen had no knowledge of these allegations until securing counsel in November 2011 as Ocwen, Saxon, LPS, and Saxon 2006-2 affirmatively concealed the information from her. Further, until the *AHMSI v. LPS* action was filed in a public court in the State of Texas, neither Ms. Andersen nor any other reasonable consumer had knowledge of the admissions of LPS to various servicers (including Saxon and Ocwen) for whom it conducted foreclosure related services as their authorized agent.

79. Further, at least one other court has found as a matter of law that "the signature of Bethany Hood, as Vice President of MERS, was fraudulent" since she was not in fact an employee of MERS. *In re Koontz*, 09-30024 HCD, 2010 WL 5625883 (Bankr. N.D. Ind. Sept. 30, 2010). The same is true in this instance since Ms. Hood was never the authorized agent or employee of Saxon 2006-2. Further, Saxon 2006-2 never authorized

24

LPS on its behalf to permit "surrogate signers" to sign Ms. Hood's signature on court documents.

80. Based upon the bogus Hood Deed of Appointment, Saxon 2006-2 through its appointed trustees commenced an improper foreclosure action against Ms. Andersen and the Property, with knowledge that it had no right to pursue that action in the manner it chose to pursue, on December 22, 2008 in the Circuit Court for Carroll County, Maryland and continued to prosecute the case, without the right to do so in the manner it was proceeding, until June 8, 2009.   This bogus foreclosure remains a part of the public records and negatively impacts Ms. Andersen's ability to obtain credit and her ability to obtain increased earnings with a position which requires a security clearance.

81. As part of its continued bogus, unfair, and deceptive collection practices, on or about June 17, 2010, Scott W. Anderson, as Vice President of Residential Loan Servicing for Ocwen and on behalf of Saxon 2006-2 signed another purported Deed of Appointment nominating Howard Bierman, Jacob Geesing, and Carrie Ward as Saxon 2006-2's substitute trustees under the Savings First Deed of Trust. This document was recorded in the land records of Carroll County, Maryland at Book 6698, Page 0004.

82. The multiple hats and bogus practices of Scott Anderson have been questioned by other courts.   One court made the following factual findings and summary of Scott Anderson's purported practices:

> With respect to Scott Anderson, who executed the November 20, 2007 MERS assignment to HSBC, he has worn various corporate hats in prior foreclosure actions decided by myself. In *Valentin,* at 2, I observed that Scott Anderson assigned the instant mortgage from MERS to HSBC, on May 1, 2007. Then, in *Cherry,* at 3, I observed that:
>
> > Scott Anderson, in his affidavit, executed on June 15, 2007, states he is Vice President of OCWEN. Yet, the June 13, 2007 assignment from MERS to HSBC is signed by the same Scott Anderson as Vice President of MERS. Did Mr.

> Anderson change his employer between June 13, 2007 and June 15, 2007. The
> Court is concerned that there may be fraud on the part of HSBC, or at least
> malfeasance. Before granting an application for an order of reference, the Court
> requires an affidavit from Mr. Anderson describing his employment history for
> the past three years. Lastly, the court notes that Scott Anderson, in the MERS to
> HSBC assignment gave his address as Suite 100. This is also the address listed for
> HSBC in the assignment.

The Court still doesn't know if Mr. Anderson is Vice President of MERS, Vice President
of OCWEN, or both. The same concerns about possible fraud by HSBC, or at least
malfeasance, just as in my *Valentin* and *Cherry* decisions still exist. The Court needs to
know Mr. Anderson's employment history and why all these banking entities are located
within the 41,860 square feet of the ever popular Suite 100.

*HSBC Bank USA, Nat. Ass'n v Antrobus*, 20 Misc. 3d 1127(A), 872 N.Y.S.2d 691 (Sup.
Ct. 2008).

83. Still further, Ocwen has publically acknowledged, before the commencement of a new

   foreclosure action against Ms. Andersen by Bierman, Geesing, and Ward LLC (described

   below), that Scott Anderson did not sign document that purported to be in his name. One

   court summarized this public admission as follows:

Kimberly Miller, in her January 5, 2011–Palm Beach Post article, "*State details
foreclosure crisis,*" wrote:

> Sweeping evidence of the case the state attorney general's office has built in its
> pursuit of foreclosure justice for Florida homeowners is outlined in a 98–page
> presentation complete with copies of allegedly forged signatures, false
> notarizations, bogus witnesses and improper mortgage assignments.

> The presentation, titled "Unfair, Deceptive and Unconscionable Acts in
> Foreclosure Cases," was given during an early December conference of the
> Florida Association of Court Clerks and Comptrollers by the attorney general's
> economic crimes division.

> It is one of the first examples of what the state has compiled in its exploration of
> foreclosure malpractice, condemning banks, mortgage servicers and law firms for
> contributing to the crisis by cutting corners ...

> In page after page of copied records, the presentation meticulously documents
> cases of questionable signatures, notarizations that could not have occurred when
> they are said to have because of when the notary stamp expires, and foreclosures
> filed by entities that might not have had legal ability to foreclose.

> It also focuses largely on assignments of mortgage [sic], documents that transfer ownership of mortgages from one bank to another. Mortgage assignments became an issue after the real estate boom, when mortgages were sold and resold, packaged into securities trusts and otherwise transferred in a labyrinthine fashion that made tracking difficult.
>
> As foreclosures mounted, the banks appointed people to create assignments, "thousands and thousands and thousands" of which were signed weekly by people who may not have known what they were signing ...
>
> In another example, the signature of Scott Anderson, an employee of West Palm Beach-based Ocwen Financial Corp., appears in four styles on mortgage assignments ...
>
> Paul Koches, executive vice president of Ocwen, acknowledged Tuesday that the signatures were not all Anderson's, but that doesn't mean they were forged, he said. Certain employees were given authorization to sign for Anderson on mortgage assignments, which Koches noted do not need to be notarized.
>
> Still, Ocwen has since stopped allowing other people to sign for Anderson, Koches said.

*HSBC Bank USA. N.A. v. Taher*, 32 Misc. 3d 1208(A), 932 N.Y.S 2d 760 (Sup. Ct.

2011).

84. On or about October 26, 2011, Bierman, Geesing, Ward, and Wood LLC improperly,

unfairly, and deceptively commenced a second consent decree foreclosure action against

the Property and Ms. Andersen on behalf of Ocwen and Saxon 2006-2 ("Foreclosure

Action II").

85. In the Foreclosure Action II, Ocwen and Saxon 2006-2 did not disclose the terms of Ms.

Andersen's modification with Saxon and instead based the Foreclosure Action II upon

the original loan terms.

86. In the Foreclosure Action II, Ocwen presented the court and Ms. Andersen with false,

deceptive, and unfair Final Loss Mitigation Affidavit dated August 2, 2011 which stated

the following·

a.  It referenced a case by Bierman, Geesing, Ward, and Wood LLC against Ms. Andersen in the "Circuit Court for Montgomery County, Maryland." There is no such case pending in the Circuit Court for Montgomery County, Maryland against Ms. Andersen by Bierman, Geesing, Ward, and Wood LLC.

b.  It stated that Saxon Mortgage Services, Inc. is "holder of the beneficial interest" of Ms. Andersen's interest.   However, before August 2, 2011, Saxon had transferred Ms. Andersen's servicing rights to Ocwen and Ms. Andersen. Further, on the Notice of Intent to Foreclose dated June 16, 2010 which is the mandatory perquisite of the Foreclosure Action II, does not identify Saxon whatsoever in the document as having any interest in Ms. Andersen's loan.

c.  It stated that "[t]he borrower's income makes the borrower ineligible under all relevant loss mitigation programs." However, for more than ten months before this statement, Ocwen knew Ms. Andersen was again employed and had substantial income necessary for multiple loss mitigation options to which it and ignored its duties and responsibilities under the Saxon 2006-2's Pooling and Servicing Agreement and the federal Making Home Affordable Program.

d.  It is purportedly signed by Rene Martinez, Contract Management Coordinator. The signature of Ms. Martinez is significantly different and varies greatly from other purported signatures of Ms. Martinez which are recorded in Maryland and other state's public records.

87. Without a legitimate signature of Ms. Martinez and a legitimate and truthful Final Loss Mitigation Affidavit, Ocwen and Saxon 2006-2 have no right to file and pursue the

Foreclosure Action II. The fact that each are continuing to do so with the right to do so is unfair, deceptive, and unconscionable.

88. Having nowhere else to turn for help, Ms. Andersen is left to seek this Court's help in preventing injustice by Saxon, Saxon 2006-2, and Ocwen of the unconscionable, illegal, unfair and deceptive acts of Ocwen described herein and ongoing.  These acts have damaged Ms. Andersen by:

    a.  incurring legal fees,

    b.  fees and costs assessed to her mortgage account based upon the bogus and otherwise improper foreclosure actions as well as late fees and charges when the loan was actually current,

    c.  damage to her credit through the public reporting of foreclosure collection actions filed in a manner to which Saxon, Ocwen, and Saxon 2006-2 had no right to pursue,

    d.  lost time from work trying to responsibly obtain a modification,

    e.  a reduction of income for more than a year and ongoing due to the fact that this otherwise resolvable situation created by Saxon 2006-2, Saxon, and Ocwen has prevented Ms. Andersen from obtaining a security clearance she would otherwise be able to receive which would mean significantly more income for her in a sum of at least $20,000 more per year on an annual basis, and

    f.  emotional damages from stress, sleeplessness, anxiety, fear and medical issues that have occurred because of issues related to the actions of Saxon 2006-2, Saxon, and Ocwen. These emotional damages have also caused a strain in Ms. Andersen's marriage and caused her numerous heightened medical issues

including a hospitalization in October 2011 related to blood clots related to stress and multiple visits to the emergency room. Ms. Andersen has incurred fees and costs for each of these visits which were not covered by her health insurance.

## COUNT I: VIOLATION OF THE FAIR DEBT COLLECTION PRACTICE ACT, 15 U.S.C. § 1692, et seq.

### (Against Ocwen Loan Services, LLC)

89. Plaintiff incorporates all preceding paragraphs as if set forth fully herein.

90. Defendant Ocwen acquired the servicing rights to Ms. Andersen's mortgage during a period in which both Saxon and Ocwen allege the loan was in default and is therefore a "Debt Collector" within the meaning of 15 U.S.C. § 1692a(6).

91. By sending false, deceptive, and misleading communications claiming that Ms. Andersen was in default on her loan modification when she was not, initiating the Foreclosure Action II in a manner to which it had no right to do so based upon bogus documents and papers, claiming Ms. Andersen did not have sufficient information for any loss mitigation options, and requesting that Ms. Andersen submit documentation to be considered for another loan modification without even honoring the first one, Ocwen is in violation of 15 U.S.C. § 1692e.

92. Ocwen's repeated attempts to collect non-existent past-due amounts and fees and interest which were capitalized into the Saxon loan modification with Ms. Andersen), including on those amounts claimed in the Foreclosure Action II constitute unfair or deceptive practices in violation of 15 U.S.C. § 1692f.

93. Ocwen is also liable for the acts of its agents on it its behalf including LPS.

94. Plaintiff has suffered actual economic and non-economic damages, as more fully described in Paragraphs 5, 29, 33, 36, 44, 66, 71 & 88 above, and have incurred attorney's fees and court costs as a result of Defendant Ocwen's conduct.

95. The FDCPA provides for statutory damages in addition to actual damages.

WHEREFORE, Plaintiff respectfully request the Court enter judgment in favor of Plaintiff and against Defendant Ocwen Loan Serving LLC for: actual damages in an amount not less than $100,000; statutory damages in the amount of $1,000; costs and attorney's fees incurred by Plaintiff; and grant Plaintiff such other and further relief as this court finds necessary and proper.

## COUNT II – VIOLATION OF THE MARYLAND CONSUMER DEBT COLLECTION ACT, MD CODE, COMM. LAW, § 14-201 *et seq.*
### *(Against All Defendants)*

96. Ms. Andersen reiterates and incorporates every allegation above as if set forth herein in full and add:

97. By threatening and proceeding an intent to foreclose based upon practices described above, Saxon, Ocwen, and Saxon 2006-2 have acted as collectors as that term is defined by § 14-201(b) of MD. CODE, COMM. LAW.

98. Ms. Andersen is a person defined by § 14-201(d) of MD. CODE, COMM. LAW.

99. The underlying mortgage transaction and threats of foreclosure as a means towards debt collection related to this complaint constitutes a "consumer transaction" as defined by § 14-201(c) of MD. CODE, COMM. LAW.

100.    Saxon, Ocwen, and Saxon 2006-2 have claimed, attempted, or threatened to enforce a right with knowledge that their right did not exist under Maryland or Federal

law until they complied with Md. Code Regs. 09.03.06.20 and Maryland foreclosure law and procedures.

101.     Ms. Andersen's damages as alleged herein were proximately caused by Saxon, Ocwen, and Saxon 2006-2's actions including damages for emotional distress or mental anguish suffered with or without accompanying physical injury as well as those damages described in ¶¶ 5, 29, 33, 36, 44, 66, 71 & 88 above.

WHEREFORE, Ms. Andersen prays for the following relief against Saxon, Ocwen, and Saxon 2006-2 for their violations of the Maryland Consumer Debt Collection Act:

    A.  A money judgment of all damages caused by Saxon, Ocwen, and Saxon 2006-2's actions, directly or indirectly, in the sum of $100,000;

    B.  Their costs including attorneys' fees as well as pre- and post-judgment interest;

    C.  Such other and further relief as the nature of their cause may require.

## COUNT III – VIOLATION OF MARYLAND'S CONSUMER PROTECTION ACT, MD. CODE ANN. COM. LAW § 13-101 *et. seq.*
*(Against All Defendants)*

102.     Ms. Andersen reiterates and incorporates every allegation above as if set forth herein in full and add:

103.     The mortgage loan transactions and foreclosure practices as set forth herein of the Defendant against the Plaintiffs are governed by the Consumer Protection Act, MD. CODE ANN. COM. LAW § 13-101 *et. seq.*

104.     Section 13-303 prohibits unfair or deceptive trade practices in the extension of consumer credit or collection of consumer debts.   The consideration of a loan modification and threat of a foreclosure action involves both the extension of credit and

32

the collection of debts.  Section 13-316 requires servicers like Saxon and Ocwen to respond to inquiries from consumers within 15 days.

105.    The Maryland Consumer Protection Act defines unfair or deceptive trade practices to include, inter alia, the following: (a) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers; and (b) Failure to state a material fact if the failure deceives or tends to deceive.

106.    By engaging in the acts and omissions set forth above, by making the misrepresentations set forth above, and by failing to disclose material facts where the failure to do so deceived or tended to deceive, the Defendants has committed unlawful or deceptive trade practices in violation of the Maryland Consumer Protection Act. Sec. 13-301(1) and (3) and Sec. 13-303(4) ("MCPA").

107.    Saxon 2006-2 is also liable for the acts of its authorized agent/servicers, Saxon and Ocwen, on its behalf in dealing with Ms. Andersen.

108.    The Defendants' conduct, as set forth above, had the capacity, tendency or effect of deceiving Ms. Andersen who in fact was deceived or misled, causing injury and loss through the unfair or deceptive prosecution, based upon incomplete and bogus responses to their requests for modifications of their loans, or threat of prosecution of a foreclosure action by Defendants directly and indirectly.

109.    Ms. Andersen's damages as alleged herein were proximately caused by Saxon's, Ocwen's, and Saxon 2006-2's actions including damages for emotional distress or mental anguish suffered with or without accompanying physical injury as well as those damages described in ¶¶ 5, 29, 33, 36, 44, 66, 71 & 88 above.

33

WHEREFORE, Ms. Andersen prays for the following relief against Saxon, Ocwen, and Saxon 2006-2 for their violations of the Maryland Consumer Protection Act:

A. They be awarded as part of this claim a sum of no less than $75,000 which represents their compensatory damages as a result of the Defendants' direct and indirect, unfair or deceptive practices as described herein including the Defendant's failure to comply with Md. Code Regs. 09.03.06.20, the FDCPA, and MCDCA;

B. They be awarded their reasonable attorney's fees and costs; and

C. That their claim should include such other and further relief as the Court deems just and proper.

## COUNT IV – MARYLAND MORTGAGE FRAUD PROTECTION ACT, MD. ANN. CODE, REAL PROP. § 7-401 MD. REAL PROP., et seq.

### (Against All Defendants)

111.    Ms. Andersen reiterates and incorporates every allegation above as if set forth herein in full and add: The Maryland Mortgage Fraud Protection Act, Md. Ann. Code, Real Prop. § 7-401 MD. REAL PROP., et seq. ("MMFPA") governs the relationship between the Defendants and Plaintiffs.

112.    MD ANN. CODE., REAL PROP. § 7-401 (c) provides: "Homeowner" means a record owner of residential real property. The Plaintiffs are record owners of the residential property in question and therefore are Homeowners.

113.    MD ANN. CODE., REAL PROP. § 7-401 (e) provides "Mortgage lending process...includes [t]he...servicing...of a mortgage loan."

34

114.    MD ANN. CODE., FINANCIAL INSTITUTIONS CODE. § 11-501 (k)(1) provides:

"Mortgage loan" means any loan or other extension of credit that is: (i) Secured, in whole or in part, by any interest in residential real property in Maryland; and (ii) If for personal, household or family purposes, in any amount."

115.    The MMFPA works to protect the interests of all parties to mortgage issues in Maryland from misstatements, misrepresentations and omissions; in this instance the MMFPA works to protect borrowers like Ms. Andersen from mortgage companies like the Defendants and ensure a level, fair playing field between all borrowers and professionals.

116.    Ms. Andersen is a homeowner in the Mortgage Lending Process as defined by the MMFPA since the actions in dispute in this lawsuit involve the servicing of her residential mortgage loan as it relates to a foreclosure action or threat of foreclosure which is an attempt to collect a certain sum on the mortgage transaction.

117.    MD ANN. CODE., REAL PROP. § 7-401 (d) provides:

"Mortgage fraud" means any action by a person made with the intent to defraud that involves:

1.    Knowingly making any deliberate misstatement, misrepresentation or omission during the mortgage lending process with the intent that the misstatement, misrepresentation or omission be relied on by a mortgage lender, borrower or any other party to the mortgage lending process;

2.    Knowingly using or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process.

3.    Receiving any proceeds or any other funds in connection with a mortgage closing that the person knows resulted from a violation of item (1) or (2) of this section;

      4.     Conspiring to violate any provisions of item of (1), (2) or (3) of this section...

118.    The Defendants have committed Mortgage Fraud by:

    i.  Knowingly making, as described herein, deliberate misstatements, misrepresentations and omissions during the mortgage lending process, including failing to respond to the Plaintiff's requests for a modification or change of their mortgage loans, with the intent that the misstatements, misrepresentations and omission be relied on by the Plaintiff and the general public;

    ii.  Knowingly using or facilitating, as described herein, the use of any deliberate misstatements, misrepresentations, and omissions during the mortgage lending process, including the state court foreclosure actions it has commenced and carried out, with the intent that the misstatements, misrepresentations, and omissions be relied on by the Plaintiff.

119.    Ms. Andersen has been damaged by the Defendants' deliberate misstatements, misrepresentations, and omissions during the mortgage lending process as stated in ¶¶ 5, 29, 33, 36, 44, 66, 71 & 88.

120.    Saxon 2006-2 is also liable for the acts of its authorized agent/servicers, Saxon and Ocwen, on its behalf in dealing with Ms. Andersen.

121.    MD ANN. CODE., REAL PROP. CODE. § 7-401 (g) provides:

Pattern of mortgage fraud means two or more incidents of mortgage fraud that:

- Involve two or more residential real properties; and

- Have similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics.

122.   Upon information and belief the Defendants have engaged in a Pattern of Mortgage Fraud by committing similar acts against two or more Maryland residential properties with similar intents, results and methods of commission as that which was committed by Defendants. This belief is based upon other matters pending in this and other courts of a similar nature involving Saxon, Ocwen, and Saxon 2006-2.

WHEREFORE, Ms. Andersen request the following on their behalf based upon the Defendants' violations of the MMFPA:

A. She be awarded as part of her claim the sum of no less than $100,000 which represents her compensatory damages as a result of the Defendants' illegal practices and misrepresentations as described in ¶¶ 5, 29, 33, 36, 44, 66, 71 & 88;

B. The Plaintiff be awarded three times her actual damages for the Defendants' willful and knowing violations;

C. She be awarded as part of the claim their reasonable attorney's fees and costs; and

D. That her claim should include such other and further relief as the Court deems just and proper.

Respectfully Submitted,

Phillip R. Robinson
Legg Law Firm, LLC
5500 Buckeystown Pike
Frederick, MD 21703
(301) 620-1016
Attorney for Plaintiff

## REQUEST FOR A JURY TRIAL

Plaintiff requests a jury trial on all claims asserted herein.

Phillip Robinson